UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DERRICK L. SMITH,

                    Plaintiff,

        v.                                          Case No. 16-cv-84-pp

BRIAN FOSTER, et al.,

                    Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 69)

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. On March 15, 2016, Magistrate Judge Nancy Joseph (the judge assigned to the case at that time) allowed the plaintiff to proceed on his claim that defendants Brian Foster, John Kind, Edward Waldron, Michelle Haese, Yana Pusich and Charles Ching failed to protect him from other inmates in violation of the Eighth Amendment. Dkt. No. 26. Judge Joseph also allowed the plaintiff to proceed on his claim that those defendants, as well as Mary Sauvey, were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment when they failed to conduct a rectal examination after the plaintiff allegedly informed them that he had been sexually assaulted. Id. Finally, Judge Joseph allowed the plaintiff to proceed on his claim that James Hilbert retaliated against him in violation of the First Amendment when Hilbert

allegedly issued a false conduct report against the plaintiff because the plaintiff had filed inmate complaints against Hilbert. Id.

On January 3, 2017, the defendants filed their motion for summary judgment. Dkt. No. 69. That motion is fully briefed and ready for the court's decision. The court will grant the defendants' motion and dismiss this lawsuit.

## I.   RELEVANT FACTS[1]

### A. Parties

At all relevant times, the plaintiff was an inmate in the custody of the Wisconsin Department of Corrections, housed at the Green Bay Correctional Institution ("GBCI"). Dkt. No. 71 at ¶12. He transferred to GBCI on August 7, 2015. Id. All of the defendants were employed by the Wisconsin Department of Corrections ("DOC") and worked at GBCI. Dkt. No. 71 at ¶1-11.

Haese worked as the Social Services Director. Id. at ¶1. In this role, she supervised social workers, chaplains and recreation leaders; oversaw religious services and recreational activities; and coordinated activities with the Division of Community Corrections. Id. Haese also worked as the Victim's Services

---

[1] The court takes the relevant facts from Defendants' Proposed Findings of Fact. Dkt. No. 71. These facts are deemed admitted for the purpose of deciding summary judgment because the plaintiff did not respond to them. See Civil L.R. 56(b)(4) (E.D. Wis.) The court takes additional facts from Defendants' Response to Plaintiff's Proposed Findings of Fact. Dkt. No. 104. The facts are undisputed unless otherwise noted.

Coordinator. Id. at ¶1. In this role, she provided information on coping, and offered services to victims of sexual assault. Id. at ¶3.

Kind worked as the Security Director. Id. at ¶4. He was responsible for developing and implementing policies and procedures related to security and ensuring a safe and secure environment for the inmates and staff. Id.

Pusich worked as a Supervising Officer 2 (a captain). Id. at ¶5. Her duties included the security, custody and control of inmates, and she supervised correctional officers and sergeants. Id. Pusich also worked as the Prison Rape Elimination Act (PREA) investigator. Id. at ¶6. As part of this role, she was charged with investigating, recording and producing a final report on all claims of sexual assault by staff and inmates assigned to her. Id.

Hilbert worked as a Correctional Sergeant. Id. at ¶11. His duties included monitoring housing units and supervising inmates. Id.

Waldron worked as a Social Worker. Id. at ¶7. The plaintiff was one of the inmates with whom Waldron worked. Id. As a social worker, Waldron assessed and evaluated new inmates' treatment and security needs; monitored, evaluated and recorded inmates' progress; provided information to inmates about institution services and programs; and coordinated services between inmates, staff and community resources. Id.

Ching worked as a Psychological Associate. Id. at ¶8. His duties included performing mental health screenings, conducting brief counseling and mental

health monitoring, providing crisis intervention and prevention, giving individual psychotherapy and making psychological assessments. Id.

Sauvey worked as a physician at GBCI. Id. at ¶10.

Foster was the Warden. Id. at ¶9. He was responsible for the overall administration and operation of GBCI and for implementing all DOC policies and directives and legislative and judicial mandates at the institution level. Id.

B. The Plaintiff's Pre-Attack Interactions with Ching

On August 24, 2015, Ching saw the plaintiff for his clinical interview. Id. at ¶16. During the interview, the plaintiff expressed frustration because he believed that staff had not properly responded to his past reports of sexual and physical assaults. Id. Ching states that the plaintiff discussed allegations from 2003, 2008-2010, and 2014 while he was incarcerated at Waupun and Colombia Correctional Institutions. Id. Ching asserts that the plaintiff did not reference a current assault at GBCI. Id. The plaintiff also discussed concerns for his safety, stating that a perpetrator of a prior assault was housed at GBCI. Id. at ¶17. Ching asserts that the plaintiff did not indicate that he had received any specific threats, nor did he indicate the name of the inmate about whom he had concerns. Id.

Ching did not immediately refer information about his conversation with the plaintiff to his supervisor (Dr. Steven Schmidt), because the plaintiff did not make any allegations of assault or harm that necessitated such a referral. Id. at ¶18. Ching did, however, consult with Schmidt within a day or two about the

plaintiff's PREA related concerns. Id. at ¶19. Schmidt told Ching that Ching did not need to take any further action because the Health Services Unit (HSU) and security were already aware of and handling the plaintiff's complaints. Id.

On September 14, 2015, Ching saw the plaintiff again. Id. at ¶20. The plaintiff stated that he had been moved to the South Cell Hall, but he was still concerned about his safety because he was seeing an inmate from a prior assault whenever the plaintiff went for appointments or other passes. Id. The plaintiff did not say that he had had contact with the other inmate, and he did not provide information about why he believed an attack was coming. Id. In fact, the plaintiff did not even identify the other inmate. Id. The plaintiff told Ching he would contact security staff about his concerns. Id. at ¶23.

Ching states that he discussed the plaintiff's memory issues with him, and the long-term effects of taking psychotropic medications. Id. at ¶21. The plaintiff agreed that he would discuss these concerns with his psychiatrist before he refused to take his psychotropic medications. Id. Ching asserts that at no time during this consultation did the plaintiff make an allegation of sexual assault or provide information about the other inmate. Id. at ¶22.

C. The Plaintiff's PREA Allegations against Vang

When an inmate makes an allegation of sexual assault to staff, the warden's office (which includes the deputy warden) and/or the security director initiate an investigation. Id. at ¶25. The investigator receives all supporting documents, such as letters, and then investigates and prepares a report on

his/her findings. Id. at ¶25. The security director reviews the investigator's report and sends it to the warden's office. Id.

On September 7, 2015, the plaintiff submitted a health service request, which stated, "I've had serious rectal pains and bleeding. I am NOT Homo or Bi-sexual. Something is seriously wrong. I NEED A DOCTOR NOW." Dkt. No. 76-1 at 106; Dkt. No. 104, ¶9, 10. The next day, he submitted another request that stated, "Please help me. I need to see the doctor a.s.a.p. I AGAIN complain of serious rectal pain and lots of bleeding for the past (5) five days. Why haven't I been called???" Dkt. No. 76-1 at 105; Dkt. No. 104, ¶9, 10.

The plaintiff asserts that on September 7 and 8, 2015, he submitted two letters to Kind and two letters to Foster, in which he asked them to help him make a PREA complaint about a sexual assault. Dkt. No. 97-1 at 5-8. In the letter, he explains that the guards instructed him to use "the phones outside," which he says he could not do. Id. at 5-6. He also states that he contacted HSU, but that no one had contacted him in response. Id. at 7-8.

On September 10, 2015, Sauvey examined the plaintiff about his complaints of rectal bleeding. Dkt. No. 71 at 110. According to Sauvey, the plaintiff denied any precipitating events at GBCI that could have caused the bleeding; he did not state that he believed the bleeding was caused by sexual assault. Id. at ¶111.

About three weeks later, the plaintiff had another appointment with Sauvey to follow up on his rectal bleeding, skin issues and chronic pain. Id. at

¶113. During the appointment, the plaintiff told Sauvey and a registered nurse (who is not a defendant) that his cellmate Booncha Vang had sexually assaulted him three weeks earlier. Id. at ¶26. The nurse notified security staff, and Kind initiated a PREA investigation. Id. at ¶27; Dkt. No. 80 at ¶6-7. Both the plaintiff and Vang were placed in temporary lock-up (TLU) status pending the investigation. Dkt. No. 71 at ¶28. (TLU is a non-punitive status used to separate inmates from the general population pending investigations. Id.)

Lieutenant Elsinger (who is not a defendant) completed an incident report, and told Sauvey to hold off any medical exams so that staff could determine whether the plaintiff should be transported to an outside health care provider to be seen by a sexual assault nurse examiner. Id. at ¶115. Once a PREA allegation is turned over to security staff for investigation, the PREA investigator dictates the procedures; all medical care is at the discretion and direction of the PREA Committee/Investigator. Id. at ¶117.

Sauvey did not examine the plaintiff on October 1, 2015, but she did order a stool test to see if there was blood in the plaintiff's stool. Id. at ¶116. The plaintiff did not request a sexual assault or rectal exam at the appointment. Id. at ¶119.

The PREA Committee decided not to send the plaintiff to a sexual assault nurse examiner because the plaintiff indicated that the assault had occurred three weeks earlier, and staff would have needed to collect any physical evidence within 120 hours of the assault. Id. at ¶122.

The next day, Pusich, to whom the PREA investigation had been assigned, interviewed the plaintiff about his allegations. Id. at ¶29. The plaintiff explained that he was experiencing rectal bleeding and that Sauvey had refused to treat him. Id. The plaintiff said that Sauvey had diagnosed him with hemorrhoids, and had told him that those were the cause of his bleeding. Id. The plaintiff did not think that Sauvey was correct. Id.

The plaintiff went on to state that his cellmate Vang had to have raped him. Id. at ¶30. The plaintiff stated that Vang had never requested sexual favors, but that Vang had offered to share his pornography with the plaintiff. Id. The plaintiff also stated that he and Vang had yelled at each other in the past, although they didn't really talk much. Id. When Pusich asked the plaintiff how Vang assaulted him, the plaintiff said that he didn't have any memory of the assault, and that Vang must have put him in a choke hold. Id. at ¶31. He said he believed that Vang had raped him because his hemorrhoids weren't that bad and wouldn't have caused the rectal bleeding. Id.

Pusich also interviewed Vang. Id. at ¶32. Vang did not know why he was in TLU. Id. Vang said that he and the plaintiff generally got along, although they did have some minor problems. Id. Vang stated that he never offered the plaintiff pornography, and he denied having any form of sexual contact with the plaintiff. Id.

After completing the two interviews and reviewing the incident report filed by Elsinger, Pusich determined that the allegations were unsubstantiated. Id. at ¶33.

The same day (October 2, 2015), Ching saw the plaintiff in the restrictive housing unit (RHU) for a clinical contact. Id. at ¶36. The plaintiff told Ching that he had been sent to the RHU after requesting to be seen for an assault that occurred about four weeks prior. Id. The plaintiff told Ching that Pusich told him that there was insufficient evidence for further action on the rape allegations. Id. The plaintiff was frustrated with the process and staff. Id. The plaintiff did not give Ching any specific information about the alleged assault, nor did he request a sexual assault examination. Id.

On October 12, 2015, Pusich sent a letter to the plaintiff, outlining the investigation process and explaining her determination. Id. at ¶34. Foster reviewed and signed off on the determination on October 19, 2015. Id.

Also on October 12, 2015, Pusich sent a letter to Haese informing her that the plaintiff had made an allegation that another inmate had sexually assaulted him. Id. at ¶37. This was the first time that anyone had referred the plaintiff to Haese for services. Id. Pusich already had finished her investigation, but, regardless of the outcome, Haese was responsible for providing sexual assault outreach services to the plaintiff. Id. at ¶38. Haese sent the plaintiff a Hope for Healing packet and information about a victim's hotline he could use to speak with a sexual assault advocate in the community. Id. Haese also sent

the plaintiff contact information for the chapel, health and psychological services units. Id.

On October 20, 2015, Ching saw the plaintiff in the treatment center. Id. at ¶39. The plaintiff said he was trying to get the warden's attention and that the institution was trying to cover up his complaints. Id. The plaintiff also asked for additional law library time, and talked about his relationships with his family members. Id. Ching states that he told the plaintiff that his role was to help the plaintiff develop ways to manage his symptoms and cope with his life; he also told the plaintiff that the plaintiff seemed more focused on establishing evidence for his PREA complaints. Id. at ¶36.

On October 27, 2015, Sauvey had a follow-up appointment with the plaintiff. Id. at ¶123. The plaintiff requested a rectal exam as part of the PREA investigation, which Pusich had already closed and found to be unsubstantiated. Id. The plaintiff did not sign an authorization for medical and/or surgical treatment, so Sauvey could not preform the rectal exam. Id. at ¶125.

Sauvey met again with the plaintiff a few days later, for a review of rectal bleeding. Id. at ¶127. The plaintiff signed an authorization and Sauvey completed the digital rectal examination. Id. at ¶128. Sauvey noted that the plaintiff had a chronic, non-acute rectal fissure, most commonly caused by hard stools. Id. at ¶129. Sauvey determined that the fissure, and not sexual assault, was the likely source of the plaintiff's rectal bleeding. Id. at ¶130.

On November 5, 2015, Haese met with the plaintiff to discuss services. Id. at ¶41. Haese remembers the plaintiff appearing agitated, and she states that he attempted to manipulate her reason for meeting with him by asking for help acquiring legal resources and representation. Id. Haese informed the plaintiff that she could not help him find an attorney, but that she could make an immediate referral to HSU if he had medical concerns; the plaintiff refused her offer. Id. at ¶42. The plaintiff also refused Haese's offer to provide him with an immediate referral to the Family Services Sexual Assault Service Advocate. Id. at ¶43. Haese told him to contact her at any time if he changed his mind. Id.

On March 17, 2016, Haese initiated a referral for sexual assault advocate services at the plaintiff's request (the same services the plaintiff had declined in November). Id. at ¶44. Haese contacted Monica Davis, the Door County Coordinator for the Sexual Assault Center of Family Services of N.E. Wisconsin. Id. Davis and the plaintiff first met on March 21, 2016, and then again during the first few days of April. Id. at ¶44-45. After the April meeting, the plaintiff wrote to Haese expressing frustration that Davis would not provide him with legal services. Id. at ¶46.

On April 10, 2016, the plaintiff wrote Haese a letter complaining about being placed in temporary lock up. Id. at ¶47. Haese talked to Kind, who told her that Smith was in temporary lock up because he kept complaining to staff

that he felt unsafe; staff placed him there until they could determine whether he needed to be put into protective confinement. Id.

On May 2, 2016, Davis again met with the plaintiff. Id. at ¶48. On May 6, Davis called Haese with concerns about the plaintiff. Id. at ¶49. Davis told Haese that the plaintiff had again asked her to provide legal services, and that she was uncomfortable meeting with him because he was trying to use her services to obtain a transfer out of Green Bay. Id. Davis explained that there was nothing else she could do for the plaintiff; he seemed safe and attended to. Id.

### D. Hilbert

On December 20, 2015, Hilbert issued the plaintiff a conduct report after the plaintiff failed to comply with Hilbert's order for him to remove his rosary in compliance with DOC policy. Id. at ¶132-34. The plaintiff was found guilty at a disciplinary hearing. Id. at ¶135.

On January 7, 2016, an inmate complaint examiner (not a defendant) contacted Hilbert about a complaint the plaintiff had filed. Id. at ¶142. Hilbert did not know that the plaintiff had filed a complaint against him, because the inmate complaint system is a confidential system. Id. at ¶143. The plaintiff's complaint alleged that when Hilbert delivered the plaintiff's mail, Hilbert had opened a large legal envelope from the Department of Justice. Id. at ¶144. Hilbert told the examiner that he had opened the envelope in the plaintiff's

presence, under policy, to ensure that it was legal in nature. Id. at ¶145. The complaint examiner recommended that the complaint be dismissed. Id.

On January 11, 2016, Hilbert issued the plaintiff a conduct report after the plaintiff yelled at Hilbert as he walked away, stating, "you come back down here I'll write you up." Id. at ¶137-38. The plaintiff was found guilty of the conduct report at a disciplinary hearing. Id. at ¶140.

On January 27, 2016, the plaintiff sent a letter to the warden's office, complaining that Sergeant James Hilbert was sexually harassing him. Id. at ¶50. A PREA investigation was initiated, and Pusich was assigned as the investigator. Id.

That same day, Pusich interviewed the plaintiff about his allegations that Hilbert had watched him exit the shower and watched him using the toilet. Id. at ¶52. Pusich interviewed Hilbert on January 29, 2016. Id. at ¶55-57. After completing the two interviews and reviewing documentation and other evidence, Pusich determined there was no evidence to support the plaintiff's allegations. Id. at ¶55-57, 146-47. On February 1, 2016, Pusich mailed a letter to the plaintiff and to Hilbert, explaining the investigation process and her determination. Id. at ¶59.

E. The Plaintiff's Failure to Protect Claim

The plaintiff raised numerous allegations in 2015 and 2016 that his safety was threatened. Id. at ¶59. The defendants assert that the institution took every allegation seriously and investigated every one, and that the plaintiff

13

was placed in temporary lockup during those investigations to keep him safe and out of general population. Id. at ¶62-65.

Institution staff investigated eight complaints by the plaintiff, including the two against Vang and Hilbert. Id. at ¶67. They could not substantiate any of the allegations, because (1) they lacked information; (2) the plaintiff changed his mind and said he would not feel threatened if released to general population; and/or (3) the allegations involved repeated claims made in already-closed investigations. Id. The plaintiff did not provide any specific or verifiable information to corroborate his concerns—the concerns either were vague or were determined to be unsubstantiated. Id. at ¶68. In addition, the plaintiff never made any Special Placement Need requests, which would have resulted in any inmate posing a threat to him being kept away from him. Id. at ¶69.

On November 11, 2015, the plaintiff had an appointment with Ching. Id. at ¶71. The plaintiff told Ching that a group of inmates had threatened to retaliate against him for reporting a sexual assault. Id. The plaintiff told Ching that he had written the warden, the security director and the social services director about the incident. Id. at ¶72. The plaintiff refused to tell Ching the names of the inmates who had allegedly threatened him. Id. Given how vague the plaintiff's information was, and given that the plaintiff already had alerted staff himself, Ching did not inform his supervisor or security staff. Id. at ¶74.

On November 30, 2015, the plaintiff sent Foster a letter, stating that he was being threatened and that staff was not doing anything about his sexual assault. Id. at ¶76. The letter was forwarded to security staff for investigation. Id. at ¶77. Pusich investigated and determined that the threats could not be substantiated. Id. at ¶78.

On December 14, 2015, Haese received two letters from the plaintiff, stating that he was being retaliated against for filing PREA complaints and that he was being denied a sexual assault examination. Id. at ¶79. Haese forwarded the letters to the security director, and Pusich and encouraged the plaintiff to contact her or security staff if anything changed. Id. at ¶80.

On December 15, 2015, Foster's office received a letter from the plaintiff, stating that he was assaulted by his cellmate and that the staff were not doing anything about it. Id. at ¶81. The letter was forwarded to security staff for investigation, and Pusich was assigned to investigate. Id. at ¶82-83. Pusich determined that the threats against Smith could not be substantiated; there was no evidence to corroborate his claim. Id. at ¶83.

The plaintiff also was concerned that he was in class with the inmate he had made sexual assault allegations against. Id. at ¶84. Pusich recommended and initiated a special placement need separation by housing unit, and ensured the inmates' class schedules were different to make sure the plaintiff and inmate had no further contact. Id. at ¶84. The investigation closed on December 18, 2015. Id.

On December 29, 2015, the plaintiff sent Waldron an Early Program Review Classification Hearing Request (the defendants do not explain what this is), requesting an early recall of his program review classification to be transferred out of GBCI because he did not feel safe there. Id. at ¶85. The plaintiff did not provide any information to explain why an early recall should be granted or why he felt unsafe, so Waldron did not approve the request. Id. at ¶86.

On January 5, 2016, the plaintiff met with his social worker; he made PREA-type allegations, but he did not provide any details about his concerns. Id. at ¶87. The plaintiff said he was afraid and did not want to go to his cell. Id. at ¶88. The social worker stopped the meeting and immediately notified Haese. Id. Haese went to speak to the plaintiff, but, again, the plaintiff did not provide any details; he said that he wanted to speak to the security director. Id. at ¶89. Haese contacted security director Kind, who sent Captain Shultz to meet with the plaintiff and Haese. Id. at ¶90. Again, the plaintiff did not provide any details; instead, he complained about day-to-day issues within the institution, such as the noise level and how staff prioritized non-emergent needs. Id. at ¶90.

On January 7, 2016, the plaintiff met with Ching. Id. at ¶91. He complained about his reported medical issues and how security staff did not respond to him about his housing concerns. Id.

On February 1, 2016, security staff placed the plaintiff in temporary lockup because he made statements that he was in fear for his safety; security staff put him in temporary lockup to remove him from general population. Id. at ¶93-95. On February 9, 2016, the plaintiff wrote to Haese about his placement, complaining that he was being retaliated against for filing PREA complaints. Id. at ¶95. Haese investigated the plaintiff's complaint on February 11, 2016, when she received the letter. Id. The restrictive housing status supervisor told Haese that there were no pending PREA complaints, and that security staff had placed the plaintiff in temporary lockup to keep him safe while they investigated his claims that he was in danger. Id. Haese responded to the plaintiff, telling him that she had discussed his concerns with the restrictive housing supervisor. Id. at ¶96. She also provided him with support materials that he had requested. Id.

Haese received two more letters from the plaintiff, dated February 13 and February 16, 2016. Id. at ¶97. In these, the plaintiff complained that he was still in temporary lockup, which he believed was in retaliation for his PREA complaints. Id. Haese investigated, and Kind informed her that the plaintiff was in lockup because staff was investigating his safety concerns. Id. at ¶98. Haese notified the plaintiff. Id.

The plaintiff met with Ching on February 16, 2016. Id. at ¶99. He was frustrated that he was still in temporary lockup. Id. The plaintiff also complained that Ching had not met with him recently. Id. at ¶100. Ching

informed the plaintiff that they had met the second week of January; the plaintiff could not remember the meeting. Id. Ching noted that the plaintiff's inaccurate memory could be contributing to his perception of his situation and of how others responded to him. Id. at ¶101.

On February 18, 2016, the plaintiff sent in two psychology service requests that contained PREA allegations; after consulting with his supervisor, Ching sent them to the PREA investigator. Id. at ¶102.

The plaintiff was released from temporary lockup on February 22, 2016. Id. at ¶103.

On June 7, 2016, the plaintiff sent a letter to Warden Eckstein,[2] alleging that he had been retaliated against for filing PREA complaints. Id. at ¶106. Cathy Francois (not a defendant) responded to the plaintiff and explained to him that he had been placed in the restrictive housing unit because he continued to claim he was in danger and he needed to be removed from general population for his protection. Id.

---

[2] Brian Foster was the warden at GBCI through January 2016, when he transferred to Waupun Correctional to become the warden there. Scott Eckstein became warden at GBCI after Foster left. http://www.wiscnews.com/bdc/news/local/article_f339d643-4344-53da-a8f6-d6f3e88e10c3.html

## II.  DISCUSSION

A. <u>Documents Not Received in Discovery</u>

Before reaching the merits of the summary judgment motion, the court addresses an issue the defendants raised regarding the documents the plaintiff provided to the court in support of his responsive pleadings. As discussed in the court's July 18, 2017 order, the defendants have argued that "[n]early every single document that Plaintiff produced in support of his response to Defendants' Motion for Summary Judgment was not produced previously in discovery." Dkt. No. 104 at 9, n. 3. They argued that the court should disregard those documents, because "many of the letters may be forged and/or created only for the purpose of creating a dispute of fact." <u>Id</u>.

In response, the plaintiff asserts that he mailed the documents to the defendants on November 25, 2016. Dkt. No. 122 at 3. He cites as proof a letter that the Wisconsin Department of Justice Division of Legal Services acknowledges it received on November 29, 2016. Dkt. No. 122-3. While the defendants agree they received the letter, they explain that there were no documents attached to the letter. Dkt. No. 123 at 2. They state that, following the plaintiff's response, the defendants' counsel did an exhaustive search for additional documents but were unable to locate any. <u>Id</u>.

The plaintiff asserts that he mailed the documents; the defendants state that they did not receive any documents. Both of these statements could be true. Things happen: items get lost in the mail, documents get misfiled at the

office, papers are accidentally thrown away. The court has no proof that it was the plaintiff's fault that the defendants did not receive the documents. The court will consider the documents the plaintiff relies on in support of his opposition to the defendants' motion for summary judgment.

B. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

C. <u>Deliberate Indifference</u>

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1369 (7th Cir. 1997) (citations omitted). This standard contains both an objective element (that the medical needs be sufficiently serious) and a subjective element (that the officials act with a sufficiently culpable state of mind). <u>Id.</u>

The plaintiff satisfies the objective prong of this standard. The parties agree, for purposes of summary judgment, that the plaintiff presented with a serious medical need: rectal bleeding.[3] <u>See</u> Dkt. No. 70 at 18. The parties disagree, however, about whether the defendants acted with a sufficiently

_____

[3] The serious condition at issue in this claim is the physical consequences the plaintiff alleges that he suffered as a result of rape, *i.e.*, the rectal bleeding. The plaintiff does not assert that he requested and was denied assistance to deal with any *psychological* trauma from having been raped. Nonetheless, the defendants referred the plaintiff to Haese for support services on October 12, 2015. Dkt. No. 71 at ¶37. Although the plaintiff asserts that he was afraid he might be raped again or attacked for having reported the rape, these allegations are relevant to the plaintiff's failure to protect claim, not to his deliberate indifference claim.

21

culpable state of mind. Specifically, the plaintiff argues that the defendants demonstrated deliberate indifference to his serious medical needs when they failed to timely provide him with a "rape test." The defendants dispute the plaintiff's assertions, arguing that they provided him with adequate medical care based on the information the plaintiff provided to them.

The plaintiff asserts that he notified Foster and Kind on September 7 and 8, 2015 that he had been sexually assaulted. He also indicates that he submitted request slips to HSU on September 7 and 8, 2015, asking to be examined because he was experiencing rectal bleeding. Neither HSU request slip mentions that the plaintiff had been sexually assaulted.

Sauvey examined the plaintiff on September 10, 2015—two to three days after the plaintiff made his requests to be examined. Her records indicate that the plaintiff had a documented history of hemorrhoids and that he "specifically denie[d], after several confirmations, that he [] had any precipitating events" that could have caused the rectal bleeding. Dkt. No. 76-1 at 63. Sauvey states that during the exam, the plaintiff made no mention of having been sexually assaulted. Dkt. No. 76 at ¶20. According to the medical records, Sauvey suggested that the plaintiff undergo a digital rectal exam to assess the success of his current medication. Dkt. No. 76-1 at 63. The records indicate that the plaintiff decided to defer the procedure to a later visit so he could review the information literature. Id. Sauvey ordered HSU staff to provide the plaintiff with

information about the digital rectal exam and to schedule the exam in two weeks. Id. at 97.

The plaintiff states that when he saw Sauvey, he "explained to her what happened and requested a rape test." Dkt. No. 100 at ¶11. He states that she told him the bleeding was caused by the hemorrhoids; he alleges that she did not follow the PREA and DOC guidelines on sexual assault. Id.

1. *Sauvey*

It is undisputed that Sauvey examined the plaintiff on September 10, 2017, three days after he first submitted a request slip stating that he was bleeding from his rectum and two days after HSU received the request. While there is a dispute about whether the plaintiff told Sauvey that he had been sexually assaulted, that dispute is not material to the question of whether Sauvey was deliberately indifferent to the plaintiff's medical needs.

Sauvey's records indicate that she documented a history of hemorrhoids—the plaintiff recently had undergone a series of tests that had confirmed internal hemorrhoids, a common and minor cause of rectal bleeding that is amenable to treatment. Dkt. No. 76 at ¶13. Her notes indicate that she suggested the plaintiff undergo a digital rectal exam to confirm the treatment was working, but that he deferred the procedure to a later appointment so he could review information about the procedure. The plaintiff does not address, let alone dispute, Sauvey's notes; instead, he states only that he requested a

rape test and that Sauvey told him that the bleeding was caused by the hemorrhoids.

The facts (viewed in the light most favorable to the the plaintiff) boil down to the following:

1) The plaintiff requested an appointment, but made no mention of a sexual assault in the requests;

2) Sauvey examined the plaintiff within two days after HSU received the first request;

3) at the appointment, the plaintiff requested a rape test;

4) Sauvey did not give the plaintiff a rape test because she believed hemorrhoids were causing the plaintiff's bleeding;

5) Sauvey suggested the plaintiff undergo a digital rectal exam to determine whether his current medication was effective; and

6) the plaintiff declined the digital rectal exam because he wanted to review information about the procedure.

Based on these facts, the court finds that no jury could reasonably conclude that Sauvey was deliberately indifferent to the plaintiff's medical needs. The plaintiff did not get the rape test he requested,[4] but disagreement with a treating physician's decisions, without more, does not suffice to show

---

[4] Neither party explains how a rape test would have addressed the plaintiff's bleeding. It seems that the only reason the plaintiff wanted the test was to provide proof that a rape had occurred. However, as previously noted, the medical condition at issue is the rectal bleeding, not the alleged rape.

deliberate indifference. <u>See</u> <u>Ciarpaglini v. Saini</u>, 352 F.3d 328, 331 (7th Cir. 2003) (a prisoner's disagreement with a medical professional about the appropriate course of treatment does not state a cognizable claim under the Eight Amendment). Sauvey believed the hemorrhoids were responsible for the bleeding, and previously had prescribed medication to deal with the condition. At the appointment, she suggested a digital rectal exam so that she could reevaluate the effectiveness of the plaintiff's medication. The plaintiff declined the exam at that appointment, so she ordered the staff to schedule the exam in two weeks after the plaintiff had an opportunity to review the information he requested. It is unclear to the court what else she could have done to address his bleeding.

Further, Sauvey performed a rectal exam on October 30, 2015—because the plaintiff requested that he receive one—even though the plaintiff told her that the bleeding had stopped about two weeks earlier. Dkt. No. 76 at ¶37. Sauvey was unable to perform an exam earlier because (1) the plaintiff initially wanted to review information about the procedure; (2) once the PREA investigation began, she was unable to perform an exam without authorization from the PREA investigator; and (3) the plaintiff did not sign an authorization for the exam until late October. <u>Id</u>. at ¶25-27, 35.

Following the exam, Sauvey noted that the plaintiff had chronic, non-acute rectal fissures most commonly caused by hard stools. <u>Id</u>. at ¶40. She

determined that the fissures were the most likely source of the rectal bleeding. Id.

In short, the court finds that no jury reasonably could conclude that Sauvey was deliberately indifferent to the plaintiff's rectal bleeding. She is entitled to summary judgment on this claim.

As an aside, the court notes that the plaintiff seems focused on his allegation that Sauvey failed to follow PREA and DOC guidelines on sexual assaults. But as Judge Joseph explained in her screening order, there is no private cause of action under PREA; Sauvey's alleged failure to comply with PREA and DOC guidelines is not the basis for a claim. See Dkt. No. 26 at 7.

### 2. *Foster, Kind, Waldron, Haese and Chang*

The plaintiff states that on September 7 and 8, 2015, he sent letters to Foster and Kind, notifying them that he had been sexually assaulted. Kind relates that he learned of the plaintiff's allegations of rape on October 1, 2015, after the plaintiff informed Sauvey of the alleged assault; Foster indicates that the first letter from the plaintiff that he has record of receiving is dated October 19, 2015. The plaintiff did not inform Waldron, Haese or Ching of the assault until after October 1, 2015, when the PREA investigation was initiated.

The court finds that there is a dispute as to when Foster and Kind learned about the sexual assault; this dispute, however, is not material to the determination of whether these defendants were deliberately indifferent to the plaintiff's serious medical condition of rectal bleeding. Even assuming Foster

and Kind received notification of the alleged rape on September 7, 2015, it is undisputed that the plaintiff received medical attention from Sauvey on September 10, 2015. None of these defendants are medical doctors, so the best they could do was to intervene to ensure that the plaintiff received timely, adequate care. As discussed at length above, Sauvey provided timely, adequate care, so no intervention by these defendants was necessary. These defendants are entitled to summary judgment on this claim.

D. Failure to Protect

A prison official is liable for failing to protect an inmate if the official "knows of and disregards an excessive risk to inmate health or safety[.]" Farmer v. Brennan, 511 U.S. 825, 837 (1994). Such a claim has an objective component (that the harm to which the prisoner was exposed was an objectively serious one) and a subjective component (that despite having actual knowledge of the risk, the official was deliberately indifferent to it). Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015).

Here, the plaintiff asserts that after he informed Foster, Kind, Waldron, Haese, Pusich and Ching that he had been raped by another inmate and was afraid that the inmate or his friends were going to attack him because he reported the rape, the defendants did nothing to protect him. Because there was no proof that the plaintiff was attacked and because he no longer is housed at GBCI, the defendants argue that the court must dismiss the plaintiff's failure-to-protect claim; they argue that he did not suffer a cognizable

legal harm. The court agrees, and will grant summary judgment in the defendants' favor on this claim.

In <u>Babcock v. White</u>, the Seventh Circuit considered the "unique situation" where an inmate who realized no physical harm and who was no longer at risk of realizing that harm could maintain a claim for money damages based only on prison officials' past failure to take measures to protect the prisoner from a known harm. 102 F.3d 267, 270 (7th Cir. 1996). The Seventh Circuit decided that a plaintiff could not maintain such a claim, at least where exposure to the risk of harm did not result from an official's malicious or sadistic intent. <u>Id</u>.

In reaching that conclusion, the Seventh Circuit looked to tort law, "which generally recognizes a damages claim only when a defendant breaches a duty owed to a plaintiff, *and the breach causes cognizable legal harm to the plaintiff*." <u>Id</u>. at 271 (emphasis added). The Seventh Circuit specifically rejected the suggestion that, in the Eighth Amendment context, no showing of harm was necessary, and held that "a failure to prevent exposure to risk of harm" does not entitle a plaintiff to monetary compensation. <u>Id</u>. at 271-72.

The plaintiff alleged that he told Ching that he was concerned for his safety, because someone currently housed at GBCI previously had sexually assaulted him. He did not identify that person; he indicated only that he was concerned, because he saw the person sometimes as he moved about the facility. The plaintiff never has named that person, never has alleged that that

person actually assaulted him, and never has alleged that anyone associated with that person attacked him. A threat of harm, without more, is insufficient to support a failure-to-protect claim.

The Seventh Circuit was careful to explain the limits of its holding. The holding does not to preclude suits by prisoners under the Eighth Amendment grounded solely on claims of psychological injury. Id. at 273. The plaintiff has not based his claim on psychological injury, however, and there is no evidence that any of the defendants acted "maliciously" or "sadistically."

To the contrary, the evidence shows that when the plaintiff made specific complaints about perceived threats, Foster and Haese forwarded the concerns to Kind for investigation, who in turn tasked security staff, including Pusich, with conducting an investigation. From November 2015 to March 2016, security staff conducted six investigations. Each time, they were unable to substantiate the plaintiff's allegations. In addition, during each investigation, Kind placed the plaintiff in TLU, a non-punitive status where an inmate is placed in a single cell, in order to protect him from possible threats in the general population.

The plaintiff has not demonstrated that he suffered any physical harm, nor has he demonstrated that the defendants' alleged failure to protect him was motivated by malice. Without such a showing, he cannot maintain a failure-to-protect claim. See Whiteside v. Pollard, 481 Fed.Appx. 270, 271-72 (7th Cir. 2012); Saunders v. Tourville, 97 Fed.Appx. 648, 649 (7th Cir. 2004)

("The standard in this circuit is clear: an inmate who suffers only a risk of physical harm has no compensable claim under the Eighth Amendment.")

E. Retaliation

At the summary judgment stage, the plaintiff has the initial burden to make out a *prima facie* case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." Hawkins v. Mitchell, 756 F.3d 983, 996 (7th Cir. 2014). The plaintiff has not made out a *prima facie* case of retaliation.

The plaintiff complains that Hilbert issued two conduct reports in retaliation for the plaintiff's complaints against him. Hilbert issued the first conduct report on December 20, 2015. Hilbert asserts that he did not find out that the plaintiff had filed a complaint against him until January 7, 2016. Dkt. No. 71 ¶132, 142. The plaintiff has provided no evidence to rebut Hilbert's assertion. Because Hilbert did not know that the plaintiff had filed a complaint about him, his decision to issue the first conduct report could not have been motivated by the plaintiff's complaint. See Tomanovich v. City of Indianapolis, 457 F.3d 656, 668 (7th Cir. 2006). The plaintiff has failed to meet his burden of proof with regard to this conduct report.

Hilbert issued the second conduct report on January 11, 2016, a few days after he learned that the plaintiff had filed an inmate complaint against

him. This "suspicious timing" is enough for the plaintiff to state a claim of retaliation, but it is not enough, on its own, for the claim to survive summary judgment. Johnson v. Kingston, 292 F.Supp.2d 1146, 1154 (W.D. Wis. 2003) ("An adverse act following hard on the heels of the exercise of a protected right might be suspicious but it would not be enough by itself to allow a reasonable jury to find that it was a reason for the defendants' decision to take an adverse action against the plaintiff.") (relying on Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 642 (7th Cir. 2002)).

The law requires the plaintiff to provide evidence demonstrating a connection between the protected activity and the adverse action. See Chatman v. Pierce, 583 Fed.Appx. 548, 550 (7th Cir. 2014) (finding that comments by a correctional officer to an inmate that he was going to "get him" were sufficient, when viewed in the chronology of events, to raise an inference of retaliatory motive). The plaintiff offered no evidence of a retaliatory motive; he points only to the timing of when he filed his inmate complaints and when Hilbert issued the conduct reports. Again, this is insufficient for the plaintiff to carry his burden at summary judgment. The court will grant summary judgment in favor of Hilbert on this claim.

## III.    CONCLUSION

The court **ORDERS** that the defendants' motion for summary judgment is **GRANTED.** Dkt. No. 69. The court **DISMISSES** this lawsuit, and will enter judgment accordingly.

31

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend that deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and to

determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 12th day of October, 2017.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**